**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| ANDRE GINNANE,<br><br>Plaintiff,<br><br>vs.<br><br>BOYS & GIRLS CLUB OF SAN ANTONIO, INC.<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. NO. 5:23-CV-341 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Andre Ginnane, (hereinafter sometimes referred as "Plaintiff" or "Ms. Ginnane") sues Defendant, BOYS & GIRLS CLUB OF SAN ANTONIO, INC. ("BGCSA), and would show the Court as follows:

## INTRODUCTION

1. Plaintiff brings this complaint against her former employer for racial discrimination and retaliation in violation of the laws of the United States, specifically 42 U.S.C. §1981. Plaintiff seeks damages, reinstatement, attorneys' fees, expert fees, taxable costs of the court, prejudgment and post-judgment interest.

## PARTIES

2. Plaintiff, ANDRE GINNANE, is a resident of Bexar County, Texas.

3. Defendant is a nonprofit corporation located in Bexar County, Texas. The Defendant can be served with process through its Register Agent, Ada Saenz, at 123 Ralph Avenue, San Antonio Texas 78204.

4. Defendant BGCSA is a local affiliate of Boys & Girls Clubs of America, which is a nationwide organization whose affiliates provide afterschool and summer programs in a safe, affordable, and fun environment. BGCSA serves children ages six to 18 years old at three stand-alone clubhouses, and offers 37 extended day programs open throughout the school year.

5. Children who wish to belong to BGCSA and use its facilities and participate in its programs pay an annual fee of $200.

## JURISDICTION AND VENUE

6. This is a civil action seeking redress for violation of rights guaranteed to the Plaintiff pursuant to 42 U.S.C. § 1981. More specifically, this action seeks monetary damages and all other appropriate relief to which Plaintiff is entitled under the law on account of discrimination in violation of 42 U.S.C. § 1981 and retaliation prohibited under that same statute.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

8. This action lies in the United States District Court for the Western District of Texas, San Antonio Division, pursuant to 28 U.S.C. § 1391(b), as the

events giving rise to Plaintiff's claims occurred substantially in Bexar County, Texas.

## CONDITIONS PRECEDENT

9. All conditions precedent have been performed, have occurred, have lapsed, or have been waived.

## FACTS

10. Plaintiff is an African-American (Black) female. Plaintiff began working for Defendant on April 19, 2021 as its Chief Executive Officer with an annual salary of $195,000 plus an annual non-discretionary bonus of $58,500.

11. On its website, Defendant promotes in part, that:

> Boys & Girls Clubs of San Antonio condemns any act of racism or discrimination in any form. . .
>
> Our mission further compels us to identify and eliminate barriers that have prevented the full participation and advancement of certain groups in our country, particularly Black, Brown, Indigenous, other persons of color, LGBTQIA+, and those with physical or mental disabilities.

12. Within the first week of being hired, Plaintiff inspected the three stand-alone facilities operated by Defendant referred to as clubhouses. These three clubhouses are known as Eastside, Calderone, and Mays Family. These clubhouses are owned by the City of San Antonio and are leased by the BGCSA and maintained by the BGCSA.

13. Eastside is located at 3503 Martin Luther King Drive, San Antonio, Texas, and primarily serves the African-American community of the city.

14. Calderone is located at 600 SW 19th Street, San Antonio, Texas, and primarily serves the Caucasian and Hispanic communities of the city.

15. The Mays Family clubhouse is located at 123 Ralph Street, San Antonio, Texas, and primarily serves the Caucasian and Hispanic communities of the city.

16. The Eastside and Calderone clubhouses were constructed in the same year.

17. Upon inspecting these three clubhouses, Plaintiff observed that Eastside was in a neglected condition compared to the other two clubhouses. Specifically, Eastside lacked in the following ways:

General cleanliness;

Storage rooms with doors or lighting which posed a safety threat to children and were outside the sight of supervision;

Lights that did not work;

Light fixtures dangling from the gymnasium ceiling (this light eventually fell, but fortunately harmed no one);

Draining issue which allowed water to drain under the building creating a pool of stagnant water both under and outside the building;

Plumbing leak which caused raw sewage to mix with the standing water under the building;

Open access to beneath the building where children would exposed to the stagnant water and raw sewage mentioned above;

The condition of the gymnasium floor posed a slip and fall hazard to the extent that it prevented children from running or playing basketball at full speed;

Coating on an outside walkway which leads to the clubhouse's playground was in disrepair and posed a slip and fall hazard, especially if wet;

No door on the boy's bathroom; and

A door to the kitchen allowing access to the facility from the outside was in disrepair allowing vagrants and others unchecked access to the building.

18. No similar problems existed at the Mays Family or Calderone clubhouses.

19. Subsequently, Plaintiff requested a City building inspector examine the cause of the standing water under the building. He concluded that it was a grading problem that had existed for at least 15 years. Approximately two weeks later and through Plaintiff's appeal to the Board of Director, BGCSA hired a building inspector to inspect the Eastside clubhouse. The hired building inspector reported, among other things, that the Eastside clubhouse had a plumbing leak which caused raw sewage to mix with the standing water under the building. The hired building inspector also noted that electrical wires were exposed under the building, to which children had access

20. Based on the discrepancies in facilities and the low level of trained supervision at Eastside compared to the other clubhouses, Plaintiff related her

concerns to her Executive Team of Tia Jackson, Ashlyn Barnes, and Ada Saenz almost immediately after her inspections of the properties. Plaintiff told her Executive Team that because the Eastside clubhouse primarily served African-American clients, BGCSA was discriminating against the African-American children who attended Eastside because of their race. Soon thereafter, one or more members of the Executive Team told BGCSA Board of Director members Tony Trevino (Immediate Past Chair of the Board of Directors) and Paul Hensley (incoming Chairman of the Board of Directors) of Plaintiff's concerns over the discriminatory treatment of the children attending the Eastside facility.

21. Not long after meeting with her Executive Team and discussing the discrimination occurring at the Eastside facility, Plaintiff also directly complained directly to Paul Hensley of BGCSA's discriminatory treatment of African-American children attending the Eastside facility.

22. Plaintiff's concerns that BGCSA operated with a discriminatory intent against African-Americans was further strengthened by conversations she had with Renee Garvens, Chief Development Officer, who was in charge of fundraising for the organization.

23. On or about May 21, 2021, Plaintiff was in the Defendant's offices with Renee Garvens, who is not African-American. At that time, the subject came up of where Plaintiff was looking to buy a home in San Antonio. Plaintiff mentioned she

was thinking about the Fair Oaks section of San Antonio. Ms. Garvens then stated that "Black people don't live there. You should look somewhere else." Ms. Garvens then called her friend who lives in Fair Oaks who confirmed "Black people don't live there." Ms. Garvens then stated "See I told you, Black people don't live there. You really should look somewhere else."

24. Plaintiff believed those statements from Ms. Garvens constituted racial harassment and discrimination because Garvens believed that because of her race, Plaintiff had to live in a certain part of town. Plaintiff reported Garvens' racist comment that day to the Defendant's Chief Human Resources Officer, Tia Jackson.

25. Because Ms. Ginnane's complaint involved two members of senior management (Ginnane and Garvens), upon information and belief, Tia Jackson reported Ms. Ginnane's complaint to members of the Board of Directors, including, but not limited to, Paul Hensley prior to Plaintiff's termination.

26. Approximately two weeks later, Plaintiff met with Renee Garvens and a BGCSA donor. The donor asked where in the city Plaintiff was living. Plaintiff responded that she was still looking. Renee Garvens then said that San Antonio is a segregated city when it comes to housing. Renee Garvens then said she had a poster of the city showing that "rich, white people live," in the Stone Oak division and that Black people live on the east side of town. Again, Plaintiff believed Ms. Garvens' statement constituted harassment and discrimination based on her race. The

following day, Plaintiff complained about this second racially motivated incident to Chief Human Resources Officer, Tia Jackson.

27. Because Ms. Ginnane's second complaint involved two members of senior management (Ginnane and Garvens), upon information and belief, Tia Jackson reported Ms. Ginnane's complaint to members of the Board of Directors, including but not limited to, Paul Hensley prior to Plaintiff's termination.

28. To Plaintiff's knowledge, BGCSA did not investigate the complaints and Defendant took no corrective or remedial action with regard to Ms. Garvens.

29. After making the complaints about Ms. Garvens to Tia Jackson, Renee Garvens had expressed to a co-worker that there had been "blowback" from members of the Board of Directors and/or donors concerning the decision to hire Plaintiff.

30. Plaintiff felt some of this "blowback" from members of the Board of Directors. Specifically, Tony Trevino required Plaintiff to provide him with written reports approximately three times per month documenting her activities. Mr. Trevino did not require Ms. Ginnane's predecessor or successor as CEO to document their activities. Ms. Ginnane's predecessor and successor are not African-American. Similarly, Tony Trevino and Paul Hensley would not allow Plaintiff to meet privately with donors, thus denigrating her status as CEO to those employed by

BGCSA, important donors, and the general public. Ms. Ginnane's predecessor and successor both were allowed to meet with donors privately.

31. On July 14, 2021, Paul Hensley, Chairman of the Board, contacted Plaintiff to set up a meeting later that day to discuss changes to the Board of Directors. When Plaintiff arrived at the meeting, Paul Hensley, Luis De La Torre, Executive Committee Board Member, and JoQuese Satterwhite, Board Member, were present. In this meeting, instead of discussing changes to the Board of Directors as he had represented, Mr. Hensley informed Plaintiff that she was terminated from her position because she was "not a good fit." Mr. Hensley emphasized that Plaintiff's termination was not for cause because she had been doing a good job.

32. Prior to her termination, Plaintiff had received no disciplinary action or negative feedback from her superiors or subordinates which would indicate that " she was not a good fit."

33. On or about December 13, 2021, BGCSA replaced Plaintiff as CEO with Ana Saenz, who is not an African-American.

**COUNT I**

**(RETALIATION 42 U.S.C. § 1981)**

34. Plaintiff re-alleges paragraphs 1 through 33, supra, as though fully set forth herein

35. 42 U.S.C. § 1981 prohibits retaliation based on complaints of racial discrimination in the making and enforcing of contracts, including the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges and conditions of the contractual relationship.

36. Section 1981 (42 U.S.C. §1981) was amended by the Civil Rights Act of 1991 to create a cause of action for retaliatory conduct occurring after the formation of a contract.

37. By complaining to Defendant about the 1) racially biased statements made by Renee Garvens as described above, and 2) the discrimination against African-Americans at the Eastside facility as described above, Plaintiff participated in an activity protected by 42 U.S.C. §1981.

38. Defendant took an adverse employment action against Plaintiff by terminating her employment after she voiced complaints of race discrimination to the Defendant.

39. A causal connection exists between Plaintiff's complaints of race discrimination and the Defendant's termination of Plaintiff's employment.

40. But for Plaintiff engaging in protected activity, Defendant would not have fired Plaintiff.

41. As a direct and proximate cause of Defendant's actions as alleged herein, Plaintiff has been damaged.

42. Defendant intentionally or with reckless disregard for Plaintiff's rights retaliated against Plaintiff and the conduct is so egregious as to warrant the imposition of punitive damages

**COUNT II**
**(RACE DISCRIMINATION 42 U.S.C. § 1981)**

43. Plaintiff re-alleges paragraphs 1-33, supra, as though fully set forth herein.

44. 42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts, including the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges and conditions of the contractual relationship.

45. At the time of her termination, Plaintiff had a contract with the Defendant for employment.

46. Plaintiff was subject to an adverse employment action, specifically, she was terminated.

47. But for Plaintiff's race, Defendant would not have terminated Plaintiff's employment.

48. Defendant intentionally discriminated against Plaintiff because of her race in violation of 42 U.S.C §1981.

49. As a direct and proximate cause of Defendant's actions as alleged herein, Plaintiff has been damaged.

50. Defendant's deliberate conduct was the moving force behind and cause of the violation of Plaintiff's rights and Plaintiff's injuries.

51. Defendant's conduct is so egregious as to warrant the imposition of punitive damages.

## DAMAGES

52. As a result of Defendant's unlawful conduct, Plaintiff has suffered economic damages, including past and future lost income, back wages, interest on back pay and front pay, lost earnings in the past, lost benefits under the contract or employment relationship, and employment benefits in the past and future. Plaintiff has also incurred other actual damages as a result of Defendant's unlawful conduct, including but not limited to pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to professional standing, injury to character and reputation, and other pecuniary and non-pecuniary losses. Plaintiff seeks reinstatement to her position as CEO, or front pay in lieu thereof.

53. The conduct committed by Defendant against Plaintiff is the type of conduct demonstrating malice or reckless indifference to the rights of the Plaintiff. Plaintiff additionally brings suit for punitive damages against Defendant

## ATTORNEYS' FEES AND EXPENSES

54. A prevailing plaintiff may recover reasonable attorneys' and experts' fees under 42 U.S.C. §1981 and the TCHRA. Plaintiff seeks all reasonable and necessary attorneys' fees in this case from Defendant, including preparation and trial of this lawsuit, post-trial, pre-appeal legal services, and any appeals. Plaintiff additionally brings suit for expert fees and all costs associated with the prosecution of this action.

## JURY DEMAND

53. Plaintiff demands a trial by jury of all the issues and facts in this case

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that:

a) The Court assume jurisdiction of this cause;

b) The Court award Plaintiff damages as specified above;

c) The Court award Plaintiff's reasonable attorneys' and expert fees and costs;

d) The Court award Plaintiffs pre- and post-judgment interest at the highest rates allowed.

e) The Court order reinstatement of Plaintiff to her position as Chief Executive Officer, or in lieu thereof, award Plaintiff front pay.

f) Plaintiff further prays for any such other relief as the Court may find proper, whether at law or in equity.

Respectfully submitted this June 23, 2023.

**ROSS • SCALISE LAW GROUP**
1104 San Antonio Street
Austin, Texas 78701
(512) 474-7677 Telephone
(512) 474-5306 Facsimile

______________________________
**CHARLES L. SCALISE**
Texas Bar No. 24064621
**DANIEL B. ROSS**
Texas Bar No. 789810
dan@rosslawgroup.com
**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was duly served via ECF on this 23rd day of June, 2023.

*/s/ Charles L. Scalise*